WILLIAM M. ARGENBRIGHT, Respondent, v. ST. LOUIS & SAN FRANCISCO RAILWAY COMPANY, Appellant.*

Kansas City Court of Appeals.   December 1, 1924.

1. CARRIERS: Where Contract Required Shipper to Feed and Water Hogs While en Route it Was Binding on Him and Relieved Carrier from Liability for His Failure so to do. Where contract of shipper required him to feed and water hogs en route it was binding upon him and relieved carrier from liability for damages resulting from failure of shipper. so to do, provided opportunity is given him to perform such duty.

2. ———: Verdict for Plaintiff for Damages as Result of Delay in Shipment of Hogs Held to Rest Solely Upon Conjecture. In an action for damages for negligent delay and improper handling of shipment of hogs, which might have contracted disease which caused the damage, by reason of other conditions than delay in shipment, a verdict for plaintiff *held* to rest solely upon conjecture.

*Corpus Juris-Cyc. References; Carriers, 10CJ, p. 95, n. 44; p. 305, n. 58.

Appeal from the Circuit Court of Henry County.—*Hon. C. A. Calvird*, Judge.

REVERSED AND REMANDED.

*John H. Lucas, William C. Lucas, John A. Gilbreath* and *W. F. Evans* for appellant.

*W. S. Jackson, C. A. Calvird, Jr.* and *F. M. Brady* for respondent.

BLAND, J.—This is an action for damages alleged to have been caused by reason of delay and improper handling in the shipment of 184 head of hogs from Mountain View, Missouri, to Ionia, Missouri.   There was a

verdict and judgment in favor of plaintiff in the sum of $400 and defendant has appealed.

The petition alleges that ·on account of the negligence of the defendant the hogs contracted a disease known as swine plague from which forty-eight head, of the value of $500, died, that others depreciated in value in a like sum, and that plaintiff expended in an effort to cure the hogs the sum of $300. The answer, among other things, pleaded the provision of the shipping contract requiring the shipper to load, unload, feed, water and attend the live stock at his own expense.

The evidence shows that plaintiff purchased the hogs at Mountain View on Friday, January 27th. The hogs had been driven on that day from Summerville, eighteen to twenty miles distant. After buying the hogs plaintiff had them vaccinated for swine plague and given the cholera serum treatment. The hogs were delivered to defendant, loaded and started on their way sometime between noon and 2 :00 P. M. on Saturday, January 28, 1922. They arrived at Springfield about midnight of the same day. The directions given by plaintiff and endorsed on the shipping contract were that the hogs should be routed by Springfield, Clinton, Windsor and thence to Ionia, the point of destination. Had the hogs been routed as directed they would have gone over the lines of the defendant to Springfield and Clinton, from Clinton to Windsor over the M. K. & T. Railroad and from Windsor to Ionia over the Rock Island Railroad. They would have left Springfield Sunday morning and arrived at Clinton at 2 :50 P. M. the same day and would have left Clinton on the M. K. & T. at 5 :30 A. M. on Monday, Jan. 30th. It is nineteen miles from Clinton to Windsor. There is no testimony as to when the train would have arrived at Windsor or what connection would have been made at Windsor for Ionia. The hogs were not shipped as directed but moved over defendant's line to Kansas City and from there to Ionia over the Rock Island Railroad. They left Springfield sometime after 2 :00 P. M. on Sunday, arriving at Kansas City sometime before

8:55 A. M. Monday and left the latter place at 9:05 Monday morning, arriving at Ionia over the Rock Island sometime Monday night. They were unloaded Tuesday morning, January 31st.

Plaintiff testified that the hogs that were delivered to the defendant "were in good condition—the majority of the hogs were in good condition—good set of hogs;" that "they were a mixed lot—mixed hogs, they were stock hogs, thin." When they were unloaded at Ionia they were very gaunt in appearance and evinced a great desire for water. Defendant's evidence tended to show that they were fed and watered at Springfield and Kansas City, but in view of plaintiff's testimony as to the condition of the hogs at the time they arrived at Ionia, the jury could find they were not properly fed and watered en route.

Plaintiff accompanied the hogs as far as Springfield where he stayed until Sunday morning and then took a passenger train to his home. The shipping contract provided: "The shipper shall load, unload, feed, water and attend to the livestock at his own expense. The company shall stop the cars at any of its regular feeding stations for so doing, for feed, water and rest, upon the written request of the shipper or attendant in charge, who shall make such request when necessary." There is no evidence of any failure of defendant to maintain proper facilities for the feeding and watering of the hogs. Plaintiff testified that the hogs were given good attention after being unloaded at Ionia but that in a short time thereafter they began to droop and he called a veterinary. Forty-eight hogs in all died, the first one six or eight days after they arrived at Ionia. The second hog died the fourteenth day and about that time the herd began to break down with the disease. The distance between Mountain View and Ionia via route designated by plaintiff was 240 to 250 miles.

Dr. Kirby, a veterinary, testifying for plaintiff, stated that he diagnosed the disease that plaintiff's hogs were suffering from and found it was swine plague; that

the germ of swine plague is similar to that of tuberculosis or any other infectious germ disease and is supposed to be always present in a herd of hogs and develops on the occurrence of anything lowering the resistance of the animal. It is a contagious disease and could be caused "by just anything that you might consider, that would be uncommon to the habit of the hog." "Any hardship, any exposure or sudden change of feed, or food that don't agree with them." That a long shipment or sudden change in the climate would be a pre-disposing factor; that hogs moved from Southern Missouri to the vicinity of Ionia in the latter part of January or the first part of February would be a pre-disposing cause. He further testified that a shipment of hogs extending over a day and a-half would be such a hardship as would tend to develop the disease in the hogs; that if the hogs were vaccinated for swine plague before shipping they might have it in a light form, but the mortality would not be high; that from his observation hogs shipped from Southern Missouri to the vicinity of Ionia would develop swine plague in fifty per cent of the cases; but nothing like that percentage would die; that if they were vaccinated for swine plague before shipment he would judge that the disease would affect from five to ten per cent.

Dr. Allen, a veterinary testifying for the plaintiff, stated that swine plague is sometimes spoken of as contagious pneumonia; that in swine plague the first thing that appears is that the hog is gaunt and very inactive; that a total or decided change of feed would make the hogs more liable to disease than otherwise; that exposure or change of climate pre-disposes hogs to the disease, also the shipping of hogs from a southern to a northern climate, or from a very dry to a moist climate, would lower its resistance and likewise if they were exposed to a cold rain, or if they were placed in an over-loaded car, and if the hogs were naturally unthrifty and wormy; that anything that would lower the resistance of the animal would tend to allow the disease to get a hold. He further testified that from his experience a majority of hogs

shipped from Southern Missouri or Arkansas had to be treated for swine plague; that a hog cannot be immuned permanently against swine plague; that vaccination is merely a temporary protection, that the treatment must be repeated several times to clear a hog of the infection; that "a temporary treatment would hold him for a while;" that shipment is hard on a hog and tends to lower his vitality, the longer the shipment the more hardship the hog is exposed to and the less resistance he has; that a hog vaccinated for swine plague prior to shipment would be protected for the time being but for how long would depend upon the amount of hardships that he endured en route; that vaccination "might hold him for three days—three weeks, that no man can tell that. It depends on another thing, that is, the virulency of the germs of the infection that he happens to be carrying. Sometimes lighter than others; some herds you can control absolutely with one vaccination, or two; and other herds you have to vaccinate three or four times—several times successively to hold them, there is no set rule for that." That in his opinion vaccination before shipment "would hold him for a time . . . but as to how long I cannot say. That would depend upon all the factors involved."

Defendant insists that its instruction in the nature of a demurrer to the evidence should have been given for the reason, among others, that the verdict rests solely upon conjecture and there was a failure to prove any proximate connection between the swine plague that developed in the hogs and the negligence of the defendant. Plaintiff tried the case and submitted it to the jury upon the theory that defendant would be liable either for delay in the shipment or failure to feed and water the hogs en route, if either of these resulted in the swine plague. Of course, defendant is not liable if the hogs became diseased by reason of the failure to feed and water the hogs enroute, or to properly do these things, for the reason that the contract provided that plaintiff should look after these matters. It is now well settled

that such a contract is binding upon the shipper and that where such a provision is inserted in the contract of shipment, the carrier is relieved from liability to that extent provided opportunity for caring for, feeding, and watering the animals is given the shipper, and if damages result from the failure of the shipper to feed and water the stock, he cannot hold the carrier responsible. [10 C. J., p. 95; Duvenick v. Mo. Pac. Rd., 57 Mo. App. 550 and cases therein cited; Schureman v. C. B. & Q. Rd., 88 Mo. App. 183; Snider v. Express Co., 63 Mo. 376.]

The one question that remains is as to whether plaintiff is entitled to recover on account of the negligent delay in the shipment of the hogs. While the petition alleges that the hogs would have arrived in Ionia within twenty-four hours had they been shipped in accordance with plaintiff's directions, the evidence does not bear out this allegation, nor does it show what time would have been required. The evidence does show that the hogs would have left Clinton at 5:30 on Monday morning, January 20th. As we have before stated, the evidence shows that it is nineteen miles from Clinton to Windsor but there is no testimony as to when the train arrived at Windsor nor what connection it made with the Rock Island train there nor when the Rock Island train arrived at Ionia. The hogs actually arrived at Ionia Monday night.

However, it is quite apparent that plaintiff will be unable to show that the hogs would have arrived at Ionia prior to Monday morning, January 30th. Had they arrived at that time it would have been twenty-four hours prior to the time that they were unloaded by plaintiff, which was on Tuesday morning, January 31st. Had they been routed as directed they would have been on the road more than a day and a-half at the time the train left Clinton, and plaintiff's expert, Dr. Kirby, testified that hogs on the road for a day and a-half would have a lowered vitality caused thereby to such an extent as would tend to develop the disease in the hogs. The evidence shows that anything that lowers the vitality of the hog

causes it to be susceptible to contract the disease; that these hogs were driven from eighteen to twenty miles the day before they were shipped; that fifty per cent of hogs shipped from Southern Missouri to the vicinity of Ionia contracted swine plague and that were such hogs vaccinated prior to shipment it would occur in five or ten per cent of the hogs so shipped. The evidence shows that had the hogs been shipped as directed, they would have been on the road upwards of forty-one hours while they were actually upon the road not to exceed sixty hours and were actually unloaded within at least forty-eight hours later than they would have been had they been shipped according to directions.

In view of the treatment the hogs received prior to the shipment and their neglect by plaintiff while en route, and the danger of shipping hogs at the time of the year from Southern Missouri under ordinary conditions, how could any jury tell whether the hogs contracted the disease by reason of the delay in shipment or by reason of the hardships they endured and their natural tendencies and whether they would not have contracted it had they arrived and been unloaded on Monday morning instead of Tuesday morning? A shipment of thirty-six hours by itself was sufficient to give the disease to hogs shipped without prior vaccination, and whether their prior vaccination would "hold" them for thirty-six or sixty hours is a matter of mere speculation under the testimony. [Gillespie v. Railroad, 144 Mo. App. 508; Schureman v. C. B. & Q. Rd., supra.]

The judgment is reversed and the cause remanded. All concur.